UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BRENDA ZEMROCK              )
                                   )
      Plaintiff,             )
                                   )
        v.                 )     Case No. 14-cv-30107-KAR
                                   )
YANKEE CANDLE CO., INC.,    )
                                   )
      Defendant.          )

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE
### (Dkt. Nos. 79 and 88)

ROBERTSON, U.S.M.J.

I.    INTRODUCTION

    Defendant Yankee Candle Company, Inc. ("Defendant" or "Yankee Candle") has moved for summary judgment with respect to the multi-count employment discrimination complaint brought by Brenda Zemrock ("Plaintiff"), a former employee. Plaintiff has brought claims against Defendant for: (1) discriminating against her due to her disability in violation of the American Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, and its Massachusetts analog, Mass. Gen. Laws ch. 151B ("Chapter 151B"), by subjecting her to a hostile work environment, constructively discharging her, and failing to reasonably accommodate her disability; (2) retaliating against her in violation of the ADA, 42 U.S.C. § 12203; and (3) discriminating against her in violation of Chapter 151B by sexually harassing her, and aiding and abetting sexual harassment (Dkt. No. 22).[1]

---

[1] Plaintiff has withdrawn Count I, which alleges a violation of the Family Medical Leave Act ("FMLA"), and Count VIII, which alleges interference with an advantageous relationship (Dkt. No. 86-11 at 3).

1

After the Massachusetts Commission Against Discrimination found probable cause (Dkt. No. 22 at 4 ¶ 33), Plaintiff removed her claims to this court and the parties have consented to the undersigned's jurisdiction. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. Before the court is Defendant's motion for summary judgment, a hearing on which was held on October 25, 2016. Plaintiff filed an opposition to Defendant's motion for summary judgment, which included Plaintiff's supporting affidavit (Dkt. No. 86). Defendant moves to strike paragraph 14 of Plaintiff's affidavit based on its alleged conflict with her deposition testimony (Dkt. No. 88). The court ALLOWS Defendant's motion to strike (Dkt. No. 88), and does not consider paragraph 14 of Plaintiff's affidavit in its decision. For the reasons stated below, Defendant's motion for summary judgment (Dkt. No. 79) is ALLOWED in part and DENIED in part.

II.     FACTUAL BACKGROUND

The court views the evidence in the light most favorable to Plaintiff, the nonmoving party. *See Lipson v. Johnson & Wales Univ.*, No. 96-159B, 1997 WL 576397, at *2 (D.R.I. July 17, 1997) (citing *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 820 (1st Cir.1991)).

Defendant is a manufacturer and retailer of scented candles and candle accessories (Dkt. No. 82-8 at ¶ 4). On December 1, 2009, Heather McPherson, the manager of Yankee Candle's retail store at the Holyoke Mall, hired Plaintiff to be a "door greeter" for the holiday season (Dkt. No. 82-1 [Plaintiff's Deposition] at 3, 4).[2] Plaintiff continued to work as a sales associate after the holidays and was promoted to second assistant manager in February 2011 (*id.*). Although

---

[2] Plaintiff received a copy of Defendant's employee handbook when she was hired and later received a revised copy (Dkt. No. 82-1 at 11; Dkt. No. 82-2 at 7, 8). The handbook contained Yankee Candle's anti-discrimination and harassment policy and code of business ethics and conduct and explained the manner in which employees could bring complaints of policy violations (Dkt. No. 82-1 at 15, 16, 20, 24-31, 33, 34-35; Dkt. No. 82-2 at 11-14, 17-24).

Plaintiff's title was "second assistant manager," she did not have any managerial or supervisory responsibilities (Dkt. No. 82-1 at 8; Dkt. No. 82-2 at 6; Dkt. No. 86-2 at 2-3 ¶¶ 1-7). McPherson and Sarah Fenton, the assistant store manager, were Plaintiff's immediate supervisors (Dkt. No. 82-1 at 7, 24, 26, 27; Dkt. No. 82-2 at 6). Plaintiff was a part-time hourly employee during her term of employment at Yankee Candle, which ended on June 28, 2012 (Dkt. No. 82-1 at 3; Dkt. No. 82-3 at 15).

On December 9, 2011, Plaintiff underwent a hysterectomy due to endometriosis and cancer (Dkt. No. 82-1 at 41, 87; Dkt. No. 86-2 at 3 ¶ 10). A second procedure was necessary shortly thereafter to stop internal bleeding (Dkt. No. 82-1 at 41, 42). Plaintiff took leave from her job at Yankee Candle pursuant to the Family Medical Leave Act ("FMLA") for her surgery and recuperation (*id.* at 40). When she returned to work on February 27, 2012, she presented Defendant with letters from her medical providers indicating restrictions that were required by her medical condition -- a prolapsed bladder (Dkt. No. 82-1 at 43, 46; Dkt. No. 82-2 at 25, 26, 27). Specifically, she could not lift objects that weighed more than fifteen pounds and needed to use the bathroom frequently (Dkt. No. 82-1 at 43, 46; Dkt. No. 82-2 at 25, 26, 27). Defendant limited Plaintiff's lifting and allowed her to use the bathroom as needed (Dkt. No. 82-1 at 44, 56, 90).[3] Because Plaintiff would be required to close and lock the store if she was working alone and had to use the bathroom, McPherson told Plaintiff that they would try to schedule a coworker to work with her (*id.* at 44, 46). However, Plaintiff was scheduled to work alone for about thirty minutes on at least "a couple occasions" (*id.* at 44-45). Plaintiff perceived that her supervisors did not like her to close the store to use the restroom when she worked alone due to

---

[3] Plaintiff took advantage of Defendant's Light Duty Program and did not lift more than fifteen pounds after her December surgery (Dkt. No. 82-1 at 46, 53-54, 56, 90; Dkt. No. 82-2 at 29).

the potential loss of business (*id.* at 46).  Plaintiff underwent a third surgery on April 19, 2012 to repair her bladder and was granted leave under the FMLA from April 17, 2012 to about May 26, 2012 (Dkt. No. 82-1 at 41; Dkt. No. 82-8 at 6; Dkt. No. 86-3 at 3).[4]

McPherson hired Matt Provost to work as a sales associate at Defendant's Holyoke Mall store in the spring of 2011, before Plaintiff's first surgery (Dkt. No. 82-1 at 9).  Shortly after Provost began working, he commented about females he saw in the mall, including a woman who worked at the kiosk outside the Yankee Candle store (*id.* at 68-69, 70, 78, 79, 80, 94).  For example, while looking at females, he told Plaintiff:  "I'd like to go up behind her and fuck her"; "[H]er tits [are] hanging out . . . and [I] would like to feel them up"; and "Oh, my God, look at her in that outfit.  She's giving me a hard on" (*id.* at 68, 69-70, 74, 78, 97-98).  Provost stated several times, "I'm so sweaty.  [M]y sweaty balls are smacking my leg. . . . I can feel the sweat dripping off them" (*id.* at 74, 75, 76-77).

Provost also commented on Plaintiff's condition due to her hysterectomy (*id.* at 41, 91-92, 93, 96).  He remarked that Plaintiff could accommodate the largest dildo and told her that she "could shove [one] up there and it would get lost" (*id.* at 91-92, 93-94).  He also said that she no longer had to be concerned about sexual positions because she had "a big open hole" (*id.* at 91-92).  He repeatedly threatened to post her information on an online dating website so that she could find a man who could "do things to [her]" (*id.* at 97).

While Provost, Plaintiff, McPherson, and Fenton were setting up the store for the semi-annual sale in May or June 2012 -- after Plaintiff's second leave of absence -- Provost described Plaintiff as "an unstuffed turkey that every man wants to fuck because [she's] a big open hole

---

[4] Plaintiff's lifting restrictions were again accommodated by Defendant's Light Duty Program when she returned to work in May 2012 (Dkt. No. 82-1 at 54-56, 90; Dkt. No. 82-2 at 28, 30-31).

with an endless tunnel that every guy would love" (*id.* at 71, 72-73, 95).  The other employees who were present, including McPherson and Fenton, laughed and joked in response to Provost's description of Plaintiff (*id.* at 31, 56-57, 68, 71, 73).  Plaintiff asked them to stop and explained that the loss of her reproductive organs was not humorous (*id.* at 73).  Their retort:  Plaintiff "wasn't as fun to be around" since her surgery (*id.* at 57).  Provost's remark and Plaintiff's colleagues' responses caused Plaintiff to feel humiliated and embarrassed and to cry (*id.* at 68, 73, 109).

According to Plaintiff, McPherson's and Fenton's reactions to Provost's comment – laughing and joking – were consistent with their previous responses to Provost's behavior and Plaintiff's complaints about it (*id.* at 69, 77, 83, 92).  Provost's vulgar comments began shortly after he was hired and continued "every day" through the term of Plaintiff's employment at Yankee Candle (*id.* at 68, 69, 70, 77, 78, 80).  When Plaintiff first heard Provost's remarks about women in the mall, she told him that they were inappropriate and asked him to stop (*id.* at 80-81).  Provost laughed (*id.*).  Plaintiff then voiced her complaints to McPherson, gave her examples of Provost's comments, and asked McPherson to speak to Provost (*id.* at 80-83).  Plaintiff averred that Provost's remarks persisted despite her repeated complaints to McPherson (*id.* at 81-82, 84, 110).  In addition, Plaintiff asked Fenton to schedule her to work at a time when Provost was not working because Plaintiff feared that she would be held responsible for his behavior if a customer overheard his vulgar remarks (*id.* at 82, 83).  Fenton did not honor Plaintiff's scheduling request (*id.* at 80, 81-82).

Although Provost's offensive language continued notwithstanding Plaintiff's complaints, she did not report Provost to anyone else because she honored McPherson's and Fenton's request for the store's problems to "stay[] in the store" (*id.* at 24-25, 26, 58, 84-85, 86, 104).  McPherson

and Fenton did not want to alert management to any issues that would cause their supervisors to scrutinize them, according to Plaintiff (*id.* at 104, 110).

The combination of Provost's unabated comments and McPherson's and Fenton's perceived encouragement of his behavior caused Plaintiff to vent her anger by lashing out at her family (*id.* at 57-58, 104). On June 27, 2012, Provost refused to stop making obscene comments and Plaintiff decided that she "couldn't take any more," despite her recent positive performance evaluation (*id.* at 57-58, 62-63, 103, 111). Arlene Belgrave, the district manager who supervised McPherson and Fenton, was at the store the next morning when Plaintiff was scheduled to open it (Dkt. No. 82-1 at 58, 63; Dkt. No. 82-3 at 6-7). Plaintiff told Belgrave that she was "done with the company" (Dkt. No. 82-1 at 65). In response to Belgrave's request for Plaintiff to explain the reason for her decision, Plaintiff described Provost's sexual comments about females in the mall and about her, including the "unstuffed turkey" analogy (*id.* at 63, 65). Plaintiff also related McPherson's and Fenton's responses to her complaints about Provost, including a note from Fenton to McPherson complaining about Plaintiff that said "karma was a, quote, unquote, bitch and it was going to bite [Plaintiff] in the fanny in the end" (*id.* at 65). Belgrave was "very nice," offered to attempt to resolve the issues, and repeatedly asked Plaintiff to stay (*id.* at 66, 86). Plaintiff declined because she feared that her report to Belgrave would prompt McPherson and Fenton to intensify their retaliation against her (Dkt. No. 82-1 at 66, 86-87; Dkt. No. 86-2 at 4 ¶19).

III. MOTION TO STRIKE

Defendant has moved to strike the paragraph of Plaintiff's affidavit in support of her opposition to Defendant's motion for summary judgment that addresses Defendant's accommodation of her need for unlimited bathroom breaks (Dkt. No. 88). As grounds for its

motion, Defendant alleges that Plaintiff's deposition testimony contradicts her affidavit. Plaintiff's deposition testimony on this point was as follows:

> Q.      Did anyone ever tell you it was a problem using the bathroom?
>
> [Plaintiff]:  No.
> . . .
> Q.      Did Yankee Candle communicate to you that if you needed to use the bathroom, you could lock up the store and use it?
>
> [Plaintiff]:  [McPherson] said that once, but they kind of like didn't really want that to happen because it would . . . make customers feel like we weren't open.

(Dkt. No. 82-1 at 44, 46).  Plaintiff's affidavit says, "I was told by my manager that I could not close the store because it would effect sales and it was against policy to leave the store unattended" (Dkt. No. 86-2 at ¶ 14).

Because Plaintiff's affidavit is at odds with her testimony and Plaintiff fails to explain the reason for the discrepancy, the court allows Defendant's motion to strike and, as noted earlier, disregards paragraph 14 of Plaintiff's affidavit.  *See Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4–5 (1st Cir. 1994) ("When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed.").

IV.      MOTION FOR SUMMARY JUDGMENT

A.      Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides in pertinent part that:  "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Genuine issues of fact are those that a factfinder could resolve in favor of the

nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P. R., Inc. v. Certain Underwriters at Lloyd's of London,* 637 F.3d 53, 56 (1st Cir. 2011)). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Once the moving party has properly supported [his] motion for summary judgment, the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor." *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir. 1997) (citing *Celotex Corp.*, 477 U.S. at 322–25). "The nonmovant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." *Iverson v. City of Boston,* 452 F.3d 94, 98 (1st Cir. 2006) (citing *Celotex Corp.,* 477 U.S. at 322–24). In determining the existence of a trialworthy issue, assessing credibility, weighing the evidence, and drawing "legitimate inferences from the facts" are within the jury's province, not the court's. *See Anderson*, 477 U.S. at 255.

B.    <u>Disability Discrimination under the ADA and Chapter 151B (Counts II, IV & V)</u>[5]

Plaintiff's claims of disability discrimination are based on allegations about Plaintiff's hysterectomy, Provost's specific vulgar references to it, and McPherson's and Fenton's reactions to Provost's comments. Count II alleges that these conditions created a hostile work environment

---

[5] Plaintiff's complaint is not a model of clarity. There is substantial overlap in the claims alleged under the ADA in Counts II and IV. Moreover, Plaintiff has abandoned claims in Count II that she was discriminated against on the basis of disability by a reduction in hours and a demotion (Dkt. No. 86-11 at 3). For purposes of this motion, the court treats Count II as alleging a hostile work environment and constructive discharge and Count IV as alleging Defendant's failure to accommodate. Count V alleges a hostile work environment under Chapter 151B on the basis of disability.

and led to Plaintiff's constructive discharge (Dkt. No. 22 at 5). Count IV alleges that Defendant failed to reasonably accommodate Plaintiff's disability (*id.* at 6-7). Count V avers that Defendant discriminated against Plaintiff in violation of Chapter 151B, § 4(16) by failing to provide a reasonable accommodation for her handicap and by subjecting her to a hostile work environment and thereby constructively terminating her employment (*id.* at 7). Because "Chapter 151B tracks the ADA in virtually all respects . . . , this [c]ourt looks to federal case law interpreting the ADA as a guide to . . . interpreting Chapter 151B." *Smith v. Pub. Schs. of Northborough-Southborough,* 133 F. Supp. 3d 289, 295 (D. Mass. 2015) (citing *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 20 n.5 (1st Cir. 2002); *Everett v. 357 Corp.*, 904 N.E.2d 733, 746 n.20 (Mass. 2009)). *See also Henry v. United Bank*, 686 F.3d 50, 59 (1st Cir. 2012).

"The ADA [and Chapter 151B] prohibit[] an employer from discriminating against an otherwise qualified individual based on a real or perceived disability." *Murray v. Warren Pumps, L.L.C.*, 821 F.3d 77, 83 (1st Cir. 2016) (citing 42 U.S.C. § 12112). *See* Mass. Gen. Laws ch. 151B, §4(16). To state a prima facie case of disability discrimination, Plaintiff has the burden of "establishing that (1) [she] suffers from a disability or handicap, as defined by the ADA and Chapter 151B, that (2) [she] was nevertheless able to perform the essential functions of [her] job, either with or without reasonable accommodation, and that (3) [her employer] took an adverse [employment] action against [her] because of, in whole or in part, [her] protected disability." *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 104 (1st Cir. 2005) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973)).

"An individual is disabled if [s]he . . . has a physical impairment which substantially limits one or more major life activities." *Quiles-Quiles v. Henderson*, 439 F.3d 1, 5 (1st Cir. 2006). Reproduction is a "major life activity" for the purposes of the ADA since "[r]eproduction

and the sexual dynamics surrounding it are central to the life process itself." *Bragdon v. Abbott*, 524 U.S. 624, 638-39 (1998). Consequently, Plaintiff suffered from a disability or handicap due to her hysterectomy.[6]

The parties acknowledge the second element: that Plaintiff was able to perform the essential functions of her job at Yankee Candle with or without reasonable accommodation. *See Tobin*, 433 F.3d at 104. The discrimination element is the center of the parties' dispute.

       1.       Hostile work environment (Counts II & V).

Plaintiff contends that Yankee Candle violated the ADA and Chapter 151B by creating and fostering a hostile work environment. *See* 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . terms, conditions, and privileges of employment."). "The First Circuit has recognized that a hostile work environment tolerated by the employer is cognizable as an adverse employment action," *Echevarria v. AstraZeneca, L.P.,* 133 F. Supp. 3d 372, 404 (D.P.R. 2015) (citing *Quiles*, 439 F.3d at 8; *Noviello v. City of Boston*, 398 F.3d 76, 89 (1st Cir. 2005)), because it amounts to "a

---

[6] Defendant's reply to Plaintiff's opposition to the motion for summary judgment takes issue with Plaintiff's statement, allegedly made for the first time in her opposition, that she is disabled by "infertility" (Dkt. No. 95 at 3-4). Defendant argues that because this differs from her previously stated disability, the hysterectomy, Plaintiff now should be precluded from asserting that she is disabled by infertility (*id.*). Defendant's contention is an unpersuasive matter of semantics. In Plaintiff's response to Defendant's first set of interrogatories, she stated that she was disabled due to the hysterectomy's affect on her "reproductive system," which is the same as saying infertility, a condition that has been recognized as a disability (Dkt. No. 95-3 at 7). *See Yindee v. C.C.H., Inc.*, 458 F.3d 599, 601 (7th Cir. 2006) ("infertility is a disability"); *Smith v. United States*, CIVIL ACTION NO. 5:14-cv-30075, 2016 WL 6782748, at *7 (S.D. W.Va. Nov. 15, 2016) (loss of fertility is a consequence of hysterectomy).

change in the 'terms and conditions of employment'" proscribed by the ADA.[7] *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quoting 42 U.S.C. § 12112(a)).

In order to prove disability-based harassment by means of a hostile work environment, plaintiff must show that she was "(1) disabled, (2) that [s]he was subjected to a hostile environment, and (3) that the hostility was directed at [her] because of [her] disability." *Quiles*, 439 F.3d at 5. The first element is established, as noted earlier, and Plaintiff points to the same evidence as proof of the second and third elements.

To establish the hostile work environment prong, Plaintiff is required to demonstrate that her "'workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of . . . [her] employment and create an abusive working environment.'" *Id.* at 7 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). *See also Noviello*, 398 F.3d at 84; *College-Town, Div. of Interco, Inc., v. Mass. Comm'n Against Discrimination*, 508 N.E.2d 587, 591 (Mass. 1987) (defining a hostile work environment as one that is "pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization, [and that] poses a formidable barrier to the full participation of an individual in the workplace"). "The conduct must be both objectively and subjectively offensive, such that a

---

[7] In a footnote, Defendant seeks dismissal of Plaintiff's claims that are grounded in the theory of disability harassment by a hostile work environment arguing that "neither the First Circuit nor the Massachusetts Supreme Judicial Court ("SJC") has squarely answered the question of whether hostile work environment claims are cognizable under the ADA or recognized under Massachusetts law" (Dkt. No. 84 at 24 n.1). Defendant cites *Murray v. Warren Pumps, L.L.C.*, 821 F.3d 77, 86 n.1 (1st Cir. 2016), in support of its argument (*id.*). However, the court in *Murray* considered the merits of the plaintiff's hostile work environment claim and Defendant fails to point to a case in which either a court in this circuit or the SJC has indicated that this theory is not viable. *Murray*, 821 F.3d at 86-87. Indeed, the First Circuit has noted that "[w]here it has been challenged, the theory has survived." *Quiles*, 439 F.3d at 5 n.1. *See also College-Town, Div. of Interco, Inc., v. Mass. Comm'n Against Discrimination*, 508 N.E.2d 587, 591 (Mass. 1987) (recognizing a hostile work environment as a discrimination theory).

reasonable person [in plaintiff's position] would find it abusive, and the plaintiff in fact perceived it to be so." *Echevarria*, 133 F. Supp. 3d at 404. *See Harris*, 510 U.S. at 21-22 ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond [the statute's] purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment and there is no . . . violation."). "The standard is sufficiently demanding to ensure that employment discrimination statutes [do] not become a general civility code in the workplace." *Echevarria*, 133 F. Supp. 3d at 404.

Plaintiff alleges that abuse by Provost and her supervisors, McPherson and Fenton, altered her employment conditions to an actionable degree (Dkt. No. 22). [8] *See Quiles*, 439 F.3d at 5. Provost used sexually offensive language to describe women in the mall shortly after he started working at Yankee Candle in the spring of 2011 (Dkt. No. 82-1 at 68-70, 74, 78, 79). He began directing his vulgar comments at Plaintiff after she underwent a hysterectomy in December 2011 (*id.* at 76, 68, 69, 70, 76, 80-83, 84). During Provost's and Fenton's discussion of sexual devices after Plaintiff's post-surgical return to work, Provost referred to the absence of Plaintiff's reproductive organs by telling her she could accommodate the largest dildo on the market and if she "shove[d] [one] up there . . . it would get lost" (*id.* at 91-94, 96). In the same vein, Provost also commented on Plaintiff's "big open hole" and its impact on sexual positions (*id.* at 91-92). Fenton laughed at Provost's offensive remarks (*id.* at 75, 91-92, 96).

---

[8] There is no dispute that McPherson, Fenton, and Provost were aware of Plaintiff's disabling condition.

Provost's inappropriate remarks continued despite Plaintiff's protests to her supervisors (*id.* at 69, 81-83, 93-94). Consequently, Plaintiff requested Fenton to arrange the schedules so that Plaintiff and Provost did not work at the same time (*id.* at 28, 70, 79, 81-83, 97). Fenton did not honor Plaintiff's request (*id.* at 80).

Provost reiterated his description of Plaintiff's condition in May or June 2012, after she returned from her second leave from Yankee Candle (*id.* at 71, 72-73, 95). Within earshot of other employees, including McPherson and Fenton, Provost described Plaintiff as "an unstuffed turkey that every man wants to fuck because [she's] a big open hole with an endless tunnel that every guy would love" (*id.* at 71-73, 95). McPherson and Fenton laughed and joked in response to Provost's description of Plaintiff (*id.* at 31, 56-57, 68, 71-73). When Plaintiff objected to McPherson's and Fenton's reactions to Provost's remark and attempted to explain the hysterectomy's life-changing impact, McPherson and Fenton continued laughing and joking about Provost's comments and they told Plaintiff she "wasn't fun to be around" since her surgery (*id.* at 57, 67, 84).

Viewing the evidence in the light most favorable to her, Plaintiff easily meets her burden of proving that under the circumstances that existed in the workplace, she, as a reasonable woman who had undergone a hysterectomy, would view Provost's comments and her supervisors' reactions to be sufficiently severe and humiliating to create an abusive work environment on the basis of disability.[9] *See Quiles,* 439 F.3d at 7; *Muzzy v. Cahillane Motors,*

---

[9] Defendant does not appear to dispute that Plaintiff was subjectively offended by Provost's continuing ridicule. *See Echevarria*, 133 F. Supp. 3d at 404. There is more than sufficient evidence on this point. Plaintiff considered Provost's comments about her disabling condition, "obscene," humiliating, and "mentally abusive" (Dkt. No. 28-1 at 57-58, 108-10). She usually cried before going to work and directed her anger and frustration at her family (*id.* at 57-58).

*Inc.*, 749 N.E.2d 691, 695 (Mass. 2001). "[A]ll the circumstances" must be examined to determine whether an actionable hostile work environment claim exists. *Harris,* 510 U.S. at 23.

> These [circumstances] may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Id.* "Subject to some policing at the outer bounds, [the hostile environment] question is . . . to be resolved by the trier of fact on the basis of inferences drawn 'from a broad array of circumstantial and often conflicting evidence.'" *Gorski v. N.H. Dep't of Corr.,* 290 F.3d 466, 474 (1st Cir. 2002) (quoting *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 895 (1st Cir. 1988)). *Accord Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31, 40 (1st Cir. 2003).

A jury could reasonably view the nature and frequency of the insults about Plaintiff's disability as creating a hostile work environment; that is, they had "a natural tendency to humiliate . . . a reasonable person" and to interfere with her work performance. *Noviello,* 398 F.3d at 93 (citing *Harris,* 510 U.S. at 23). It cannot be said, as a matter of law, that Plaintiff was the target of normal workplace banter. *See Crespo v. Schering Plough Del Caribe, Inc.*, 231 F. Supp. 2d 420, 428 (D.P.R. 2002), *aff'd sub nom. Lee-Crespo v. Schering-Plough Del Caribe, Inc.*, 354 F.3d 34 (1st Cir. 2003) ("A court should filter out complaints on '"the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."'") (quoting *Faragher,* 524 U.S. at 788). Instead, Provost's ridicule graphically described her disability. *Compare Quiles,* 439 F.3d at 7 (evidence that plaintiff's superiors harassed and ridiculed him daily about his disability was sufficient for a reasonable jury to find a hostile work environment). A factfinder could reasonably view the harassment as

pervasive based on the alleged frequency of Provost's disparaging remarks during the approximately fourteen weeks between the time Plaintiff returned to work in February 2012 after the hysterectomy and her resignation on June 28, 2012, even taking into account her second leave in April and May 2012 (Dkt. No. 82-8 at 6). *Compare Desardouin v. City of Rochester*, 708 F.3d 102, 106 (2d Cir. 2013) ("The weekly repetition of [a sexually offensive] remark over several weeks only served to re[i]nforce its offensive meaning and to make sexual intimidation, ridicule, and insult a pervasive part of [plaintiff's] workplace, effectively changing the terms and conditions of her employment."). Alternatively, frequent repetition of vulgar comments is not required because even "a single act of harassment may, if egregious enough, suffice to evince a hostile work environment." *Noviello*, 398 F.3d at 84. *See EEOC v. Int'l Profit Assocs., Inc.,* No. 01C4427, 2008 WL 4876860, at *7 (N.D. Ill., July 14, 2008) ("Harassment need not be severe *and* pervasive to impose liability; one or the other will do."). Whether Provost's public descriptions of Plaintiff's loss of her reproductive organs -- a private and sensitive physical condition -- can be considered "egregious" presents a genuine question of material fact. *Noviello,* 398 F.3d at 84. *Compare Valentin-Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 94 (1st Cir. 2006) ("[a]lthough offhand remarks and isolated incidents are not enough, '[e]vidence of sexual remarks, innuendoes, ridicule, and intimidation may be sufficient to support a jury verdict for a hostile work environment'" under Title VII) (quoting *O'Rourke v. City of Providence,* 235 F.3d 713, 729 (1st Cir. 2001)).

In addition to Provost's vulgar descriptions of Plaintiff, McPherson's and Fenton's alleged reactions to the insults and their failure to control Provost's offensive language notwithstanding Plaintiff's persistent complaints must be considered as part of the totality of the circumstances of Plaintiff's work environment. "A deaf ear from management may contribute to and encourage

the hostility of the workplace, creating an impression that employees may engage in . . . harassment or discrimination with impunity." *Chapin v. Univ. of Mass. at Lowell*, 977 F. Supp. 72, 80 (D. Mass. 1997). *See also Ruffino v. State St. Bank & Tr. Co.*, 908 F. Supp. 1019, 1038 (D. Mass. 1995) ("hostile environment discrimination typically is not confined to one act, directed at one individual one time; rather, it is a composite of workplace action and inaction"). A factfinder could reasonably find further support for the existence of a hostile work environment from evidence that McPherson and Fenton encouraged Provost's ridicule of Plaintiff's disability by permitting it to continue, joining his discussions, and laughing at his offensive language. *Compare Arrieta-Colon v. Wal-Mart P.R., Inc.*, 434 F.3d 75, 89 (1st Cir. 2006) (evidence that plaintiff's co-workers and supervisors subjected him to "constant mockery and harassment" due to his condition and "evidence that [plaintiff's] supervisors knew about the harassing conduct and rather than stop it, participated in it" was sufficient to support the jury's verdict).

Plaintiff has presented sufficient evidence of disability discrimination by a hostile work environment under both the ADA and Chapter 151B to survive a summary judgment motion. Accordingly, Defendant's motion for summary judgment is denied as to Counts II (ADA) and V (Chapter 151B) of Plaintiff's first amended complaint.

### 2. Constructive discharge (Counts II & V).

Plaintiff contends that the harassment she endured at work was so egregious that she was forced to resign and, therefore, was constructively discharged by Defendant. "'Constructive discharge' usually refers to 'harassment so severe and oppressive that staying on the job while seeking redress – the rule save in exceptional cases – is "intolerable."'" *Lee-Crespo*, 354 F.3d at 45 (quoting *Reed v. M.B.N.A. Mktg. Sys., Inc.*, 333 F.3d 27, 33 (1st Cir. 2003)). *See Melendez-*

*Arroyo v. Cutler-Hammer de P.R. Co.*, 273 F.3d 30, 36 (1st Cir. 2001) (describing constructive discharge as "treatment so hostile or degrading that no reasonable employee would tolerate continuing in the position").[10]  "In other words, work conditions must have been so intolerable that [Plaintiff's] decision to resign was 'void of choice or free will' -- that her only option was to quit."  *EEOC v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 134 (1st Cir. 2014) (quoting *Torrech–Hernández v. Gen. Elec. Co.,* 519 F.3d 41, 50 (1st Cir. 2008)).  "This standard is entirely objective – [courts] do not put weight on the employee's subjective beliefs, '"no matter how sincerely held."'"  *Id.* (quoting *Torrech-Hernández,* 519 F.3d at 52).  *See also Lee-Crespo*, 354 F.3d at 45; *Calhoun v. Acme Cleveland Corp.,* 798 F.2d 559, 561 (1st Cir. 1986) ("'[T]he law does not permit an employee's subjective perceptions to govern a claim of constructive discharge.'") (quoting *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985)).  The purely objective test distinguishes the standard to prove constructive discharge from that used to determine discrimination based on a hostile work environment.  *See Marrero v. Goya of P. R., Inc.*, 304 F.3d 7, 28 (1st Cir. 2002) ("[T]he fact that the plaintiff endured a hostile work environment -- without more -- will not always support a finding of constructive discharge."); *Landgraf v. U.S.I. Film Prods.,* 968 F.2d 427, 430 (5th Cir. 1992) ("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment.").

Defendant's contention -- that Plaintiff fails to meet the objective reasonable person standard because she did not avail herself of all available avenues of redress before she decided to leave her job due to Provost's remarks -- is persuasive (Dkt. No. 84 at 8-11).  On the day

---

[10] Massachusetts courts have adopted the federal standard of proof for claims of constructive discharge.  *See G.T.E. Prods. Corp. v. Stewart*, 653 N.E.2d 161, 168-69 (Mass. 1995).

Plaintiff resigned, she told Belgrave, the district manager, her reasons for leaving the job at Yankee Candle and gave details of Provost's vulgar language and her repeated complaints to McPherson and Fenton (Dkt. No. 82-1 at 62-63, 65). Belgrave responded by offering to rectify Plaintiff's working conditions and repeatedly attempted to get Plaintiff to reconsider her decision to leave (*id.* at 66-67, 86). Plaintiff declined Belgrave's offers and left (*id.*). She feared that, if she stayed, McPherson and Fenton would retaliate against her "even more" because she complained to Belgrave about the store (*id.* at 66, 86-87).

Plaintiff's "choice to resign was 'grossly premature, as it was based entirely on [her] own worst-case-scenario assumption'" that Yankee Candle would not correct the harassment in the store and would permit retribution by the store's managers, despite Defendant's policy against retaliation (Dkt. No. 82-2 at 14, 23). *Kohl's Dept. Stores, Inc.*, 774 F.3d at 134 (quoting *Torrech-Hernández*, 519 F.3d at 52). *See Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998) ("fear of future retaliation is not sufficient to support [plaintiff's] claim of constructive discharge"). "[A]n employee is 'obliged "not to assume the worst, and not to jump to conclusions too fast."'" *Torrech-Hernández*, 519 F.3d at 52 (quoting *Agnew v. B.A.S.F. Corp.*, 286 F.3d 307, 310 (6th Cir. 2002)). Here, undisputed evidence shows that Plaintiff "not only jumped to a conclusion prematurely, but she also actively disregarded an opportunity to resolve [the] issues" that caused her to resign (Dkt. No. 82-1 at 66, 86). *See Kohl's Dep't Stores, Inc.*, 774 F.3d at 134 ("[A] reasonable person would simply not feel 'compelled to resign' when her employer offered to discuss other work arrangements with her.") (quoting *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 441 (7th Cir. 2000)); *Cramer v. Bojangles' Rests., Inc.*, 498 Fed. App'x 885, 887 (11th Cir. 2012) (finding insufficient evidence of constructive discharge where employee refused to give employer "an opportunity to correct the situation"); *Williams v.*

*Barnhill's Buffet, Inc.*, 290 F. App'x 759, 762 (5th Cir. 2008) ("An employee who resigns without affording the employer a reasonable opportunity to address her concerns has not been constructively discharged.").

"Because . . . a reasonable person in [Plaintiff's] position "would not have concluded that departing from her job was her only available choice, . . . [Plaintiff] has failed to meet the 'reasonable person' element for a constructive discharge claim." *Kohl's Dep't Stores, Inc.*, 774 F.3d at 135. Accordingly, Defendant is entitled to summary judgment on so much of Counts II and V of Plaintiff's first amended complaint as allege constructive discharge.

3.    Failure to accommodate (Counts IV & V).

Plaintiff contends that Defendant failed to reasonably accommodate her need to frequently use the bathroom due to her bladder prolapse after the hysterectomy. "The ADA requires that employers make reasonable accommodations for an employee's known disability." *EEOC v. Cast Prod., Inc.*, No. 07 C 5457, 2009 WL 595935, at *6 (N.D. Ill. Mar. 9, 2009) (citing 42 U.S.C. § 12112(b)(5)(A)). An employer's failure to make reasonable accommodations constitutes discrimination. *See Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999); 42 U.S.C. § 12112(b)(5)(A). "In general, 'a disability discrimination claim based upon a failure to accommodate requires a plaintiff to show that: (1) she is a handicapped person within the meaning of the statute; (2) she is qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the employer knew of her disability but did not reasonably accommodate it upon a request.'" *Aulisio v. Baystate Health Sys., Inc.*, Civil Action No. 11-30027-KPN, 2012 WL 3947738, at *5 (D. Mass. Sept. 7, 2012) (quoting *Henry*, 686 F.3d at 59–60). The first two elements mirror those of a prima facie case of discrimination and, as discussed above, they are satisfied. Therefore, the focus is on the third element.

A letter from Plaintiff's physician notified Defendant of Plaintiff's condition and requested that she be permitted to use the bathroom as needed (Dkt. Nos. 82-1 at 43; Dkt. No. 82-2 at 25). Defendant reasonably accommodated this request by ensuring that Plaintiff usually did not work alone and, whether she was alone or not, could use the restroom, which was located in the back of the store, at any time (Dkt. No. 82-1 at 16, 44, 56; Dkt. No. 82-3 at 25-26). Plaintiff was told that if she was working alone, she could close and lock the store when she used the bathroom (Dkt. No. 82-1 at 44, 46). Plaintiff's contention -- that this was not a reasonable accommodation -- is based wholly on her perception that her supervisors, McPherson and Fenton, did not favor this practice due to the potential loss of business (*id.* at 46). However, Plaintiff's subjective view of Defendant's willingness to provide a reasonable accommodation is not controlling. *See Murray*, 821 F.3d at 86 (disregarding plaintiff's "subjective assumption" that was not supported by the evidence); *Parker v. Accellent, Inc.*, Civil No. 13-cv-053-JL, 2014 WL 6071550, *7 (D.N.H. Nov. 13, 2014) (disregarding plaintiff's subjective view of her employer's offer of an accommodation). Plaintiff's failure to point to any evidence to demonstrate that Defendant prevented her from using the bathroom when she needed to do so dooms her claim as a matter of law. *Compare Burdett-Foster v. Blue Cross Blue Shield of Mich.*, 574 F. App'x 672, 680 (6th Cir. 2014) (rejecting plaintiff's claim that she was harassed based on the number of bathroom breaks she took; defendant accommodated plaintiff by permitting her use the bathroom as much as necessary and plaintiff did not allege that defendant or any employee "actually did or said anything to discourage or prevent her frequent use of the bathroom"); *Aulisio*, 2012 WL 3947738, at *7 (despite plaintiff's personal feeling that employer had a "negative demeanor" at the meeting to discuss her reasonable accommodation, "the record undisputedly supports [d]efendants' argument that they reasonably accommodated one of [p]laintiff's requests").

Defendant's reasonable accommodation of Plaintiff's disability warrants granting Defendant's motion for summary judgment on Plaintiff's claims of failure to accommodate in Counts IV and V.

C.       Retaliation under the ADA (Count III)

In Count III, Plaintiff contends that her repeated complaints about Provost's vulgar language prompted Defendant to retaliate by subjecting her to a hostile work environment.[11] "The ADA's retaliation provision states:  'No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.'" *Wright v. CompUSA, Inc.*, 352 F.3d 472, 477 (1st Cir. 2003) (quoting 42 U.S.C. § 12203(a)).  Harassment of an employee to a degree that creates or exacerbates a hostile work environment is cognizable as retaliation under the ADA.  *Noviello,* 398 F.3d at 89.  To establish a prima facie claim of retaliatory harassment, Plaintiff must show (1) that she engaged in protected conduct, (2) that she experienced an adverse employment action in the form of the "creation of a hostile work environment or the intensification of a pre-existing hostile environment," and (3) that there was a causal connection between the protected conduct and the adverse employment action.  *Quiles*, 439 F.3d at 8.  *See Noviello*, 398 F.3d at 88-89.

1.       Protected conduct

_____

[11] This count of the first amended complaint also asserts claims for retaliation by constructive termination and failure to accommodate Plaintiff's need for frequent bathroom breaks (Dkt. No. 22 at 6).  Because these claims fail for the reasons previously discussed, the court focuses on the hostile work environment as a basis for Plaintiff's retaliation claim.

For purposes of its motion, Defendant does not dispute that Plaintiff engaged in protected conduct by complaining to her supervisors about Provost's sexually offensive language (Dkt. No. 80 at 6 ¶ 48; Dkt. No. 82-1 at 20, 23, 24, 30, 69, 74-75, 77-82; Dkt. No. 85 at 5 ¶ 11). *See Valentin-Almeyda*, 447 F.3d at 94 ("Protected conduct includes not only the filing of administrative complaints . . . but also complaining to one's supervisors.").

### 2. Adverse employment action

"[W]orkplace harassment, if sufficiently severe or pervasive, may in and of itself constitute an adverse employment action sufficient to satisfy the second prong of the prima facie case . . . for retaliation cases." *Noviello*, 398 F.3d at 89. The retaliatory-harassment analysis involves examination of the same conduct and factors that established harassment on the basis of disability in Counts II and V. *See id.* at 93 (courts consider "the relative ubiquity of the retaliatory conduct, its severity, its natural tendency to humiliate (and, on occasion, physically threaten) a reasonable person, and its capacity to interfere with the plaintiff's work performance") (citing *Harris,* 510 U.S. at 23).

The events, described above, which occurred during the fourteen weeks that Plaintiff worked after her hysterectomy, support the inference that Provost's targeting of Plaintiff's disability and the supervisors' encouragement of that harassment created a hostile work environment.

### 3. Causation

"Under the third element of the retaliation claim, plaintiff must furnish evidence of a causal connection between the protected conduct and the adverse employment action." *Dickinson v. UMass. Mem'l Med. Grp.*, Civil Action No. 09-40149-FDS, 2011 WL 1155497, at *14 (D. Mass. Mar. 24, 2011). This element involves an inquiry into Plaintiff's supervisors' and

coworkers' motive, intent, or state of mind, which may be proved by circumstantial evidence. *See Quiles*, 439 F.3d at 9; *Noviello,* 398 F.3d at 93; *see also Palmquist v. Shinseki*, 689 F.3d 66, 73-74 (1st Cir. 2012) (a claim of retaliation under the ADA requires plaintiff to prove that her protected conduct was the but-for cause of the adverse action). Issues involving questions of motive, intent, and state of mind, such as this, are not usually appropriate for resolution at the summary judgment stage. *See Santiago-Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 54 (1st Cir. 2000) ("[C]ourts should exercise particular caution before granting summary judgment for employers on issues such a pretext, motive and intent.").

"Harassment by coworkers as a punishment for undertaking protected activity is a paradigmatic example of adverse treatment spurred by retaliatory motives and, as such, is likely to deter the complaining party (or others) from engaging in protected activity." *Noviello*, 398 F.3d at 90 (citing *Ray v. Henderson,* 217 F.3d 1234, 1245 (9th Cir. 2000)). "[T]here are many sources of circumstantial evidence that . . . can demonstrate retaliation . . . [including] comments by the employer which intimate a retaliatory mindset." *Mesnick*, 950 F.2d at 828. In the instant case, a jury could reasonably infer that Plaintiff's persistent complaints about Provost provoked additional insults from him and that McPherson and Fenton sided with Provost and retaliated against Plaintiff by encouraging Provost's remarks, characterizing Plaintiff as "mean" and not "as much fun to be around," and criticizing her in a written note (Dkt. No. 82-1 at 57, 65, 67; Dkt. No. 86-5 at 2). Temporal proximity between the protected activity and the retaliation is considered in the causation calculus. *See Clark Cty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273–74 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'")

(citation omitted).  Here, Plaintiff's protected conduct – multiple complaints to McPherson and Fenton about Provost's offensive language – and the retaliation – Provost's continued harassment that her supervisors tolerated and that emboldened him – was ongoing during the relatively short time span of fourteen weeks.  *Compare Che,* 342 F.3d at 38 ("[E]vidence of discriminatory or disparate treatment in the time period between the protected activity and the adverse employment action can be sufficient to show a causal connection.").  While the evidence of exacerbation of harassment is not overwhelming, the totality of the evidence could permit a reasonable jury to find that the "harassing insults" that Provost continued to direct at Plaintiff, and McPherson's and Fenton's encouragement of them "stemm[ed] from a retaliatory animus" aroused by Plaintiff's numerous complaints about Provost.  *Noviello*, 398 F.3d at 93.  Consequently, Defendant's motion for summary judgment on Count III of Plaintiff's first amended complaint alleging retaliation by tolerating a hostile work environment is denied.

    D.    <u>Sexual Harassment under Chapter 151B (Counts VI & VII)</u>

    1.    Sexual harassment by tolerating a hostile work environment (Count VI).

Plaintiff's claim that she was sexually harassed by being subjected to a hostile work environment is brought pursuant to section 4(16A) of Chapter 151B, which proscribes an employer's or its agents' sexual harassment of an employee (Dkt. No. 22 at 7-8).  *See* Mass. Gen. Laws ch. 151B, § 4(16A).  "To prevail on a claim of sexual harassment based on the creation of a sexually hostile or offensive work environment, the plaintiff bears the burden of establishing that the conduct alleged was both 'subjectively offensive' and 'sufficiently severe and pervasive to interfere with a reasonable person's work performance.'"  *Gyulakian v. Lexus of Watertown, Inc.*, 56 N.E.3d 785, 792 (Mass. 2016) (quoting *Dahms v. Cognex Corp.,* 914 N.E.2d 872, 884 (Mass. 2009)).  *See College–Town,* 508 N.E.2d at 591.  "A sexually hostile or offensive work

environment is one that is 'pervaded by harassment or abuse,' resulting in 'intimidation, humiliation, and stigmatization' that poses a '"formidable barrier" to the plaintiff's full participation in the workplace.'" *Gyulakian*, 56 N.E.3d at 792-93 (quoting *Pelletier v. Somerset,* 939 N.E.2d 717, 733 (Mass. 2010)).

That Provost's alleged offensive remarks were of a "sexual nature" cannot be disputed. Mass. Gen. Laws ch. 151B, § 1(18). In addition to Provost's vulgar descriptions of Plaintiff's reproductive system after the hysterectomy, his repertoire included comments on the "tits" and "ass[es]" of females who he saw in the mall, and descriptions of his sexual arousal (Dkt. No. 82-1 at 68-70, 74, 75, 78, 94, 97-98); an expressed desire to "go up behind [a female who he saw bending over] and fuck her" (*id.* at 68, 69, 78, 94); complaints to Plaintiff about his "sweaty balls" (*id.* at 74-77, 78); "offensive jokes about sex" (*id.* at 96), *see Morehouse v. Berkshire Gas Co.*, 989 F. Supp. 54, 62 (D. Mass. 1997); and discussions of sexual devices with Fenton, including "different size dildos" (Dkt. No. 82-1 at 91, 93).

Plaintiff has satisfied the requirement that the verbal conduct be "subjectively offensive" by her evidence that she chastised Provost for his inappropriate actions, and complained to McPherson and Fenton, requesting them to take action to curb Provost's behavior (*id.* at 79, 84). *Gyulakian*, 56 N.E.3d at 792 (*quoting Dahms*, 914 N.E.2d at 884).[12]

---

[12] McPherson, the store's manager, and Fenton, the assistant manager, allegedly discouraged Plaintiff from reporting Provost to others in higher level management positions (Dkt. No. 82-1 at 24-25, 26, 58, 84-85, 86, 104). They wanted the store's problems to "stay[] in the store" to avoid management's criticism and oversight (*id.* at 25, 58). Despite Defendant's contrary argument, the fact that Plaintiff complained only to McPherson and Fenton is of no moment to Plaintiff's proof of a prima facie case (*id.* at 24-25, 26, 58, 84-85, 86, 104, 110). *See Gyulakian*, 56 N.E.3d at 796 ("There is no bright line rule delineating who must be notified before an employer has been put on notice of harassment in the workplace."). In fact, Plaintiff alleges that her supervisors witnessed some of Provost's sexually offensive comments (Dkt. No. 82-1 at 57, 68, 72-73, 91-94, 96-97). *See id.* (managers who witnessed employee's offensive sexual conduct were put on notice of the sexually offensive work environment).

Defendant's contention -- that Provost's comments were not objectively offensive as a matter of law -- fails. *See Dahms,* 914 N.E.2d at 884. "This 'objective' reasonable person standard has been interpreted to mean that evidence of sexual harassment is to be considered from the 'view of a reasonable person in the plaintiff's position.'" *Muzzy*, 749 N.E.2d at 694 (quoting *Ramsdell v. W. Mass. Bus Lines, Inc.*, 615 N.E.2d 192, 677-78 n.3 (Mass. 1993)). Plaintiff's evidence is that Provost's vulgar sexual comments pervaded the workplace. *See Ruffino*, 908 F. Supp. at 1036 n.28 ("The pervasive use of insulting and demeaning terms relative to women in general may serve as evidence of a hostile environment."). *Compare Ellison v. Brady,* 924 F.2d 872, 878 (9th Cir. 1991) (holding that the severity or seriousness of harassing conduct varies inversely with the pervasiveness or frequency of the conduct). According to Plaintiff, Provost's sexual remarks about females in the mall began shortly after he began work in the spring of 2011 and his vulgar language persisted as long as he and Plaintiff worked together (Dkt. No. 82-1 at 4, 9, 68-70, 78-84, 97-98, 104). According to Plaintiff, Provost "constantly" made sexual comments; "[t]hat's all he would like to talk about" (*id.* at 67, 69, 70, 79, 95). *See Sauer v. Belfor U.S.A. Grp., Inc.*, Civil Action No. 15-11882-NMG, 2016 WL 4697335, at *5 (D. Mass. Sept. 7, 2016) ("The multiple incidents [plaintiff] describes cannot be taken in isolation but rather must be viewed as a whole."). In addition, Defendant's employees' failure to discipline Provost and their tacit approval of his behavior, despite Plaintiff's repeated complaints, "may be considered part of the environment in which . . . [P]laintiff worked" (Dkt. No. 82-1 at 79, 80-84, 104, 110). *Cuddyer v. Stop & Shop Supermkt. Co.*, 750 N.E.2d 928, 943 (Mass. 2001).[13]

---

[13] To support its contention that the environment was not objectively hostile, Defendant relies on federal cases based on Title VII (Dkt. No. 84 at 20-22). Defendant ignores the Massachusetts SJC's pronouncement that

A reasonable jury could find that the store's environment was sexually hostile to the degree that it could hinder a female employee's work performance or alter the terms and conditions of her employment. *See Gyulakian*, 56 N.E.3d at 793; *College-Town,* 508 N.E.2d at 591. Consequently, Defendant's motion for summary judgment on Count VI is denied.

### 2. Aiding and abetting sexual harassment (Count VII).

Plaintiff alleges that Defendant's employees and management violated section 4(5) of Chapter 151B by failing "to investigate the sexually offensive/hostile work environment or take remedial action to correct the same" (Dkt. No. 22 at 8). The pertinent provision of Chapter 151B says that it is unlawful "[f]or any person, whether employer or employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter . . . ." Mass. Gen. Laws ch. 151B, § 4(5). "Liability for aiding and abetting discrimination extends to 'individuals, including co-employees of the allegedly aggrieved employee.'" *Ping Zhao v. Bay Path Coll.*, 982 F. Supp. 2d 104, 115 (D. Mass. 2013) (quoting *Chapin*, 977 F. Supp. at 78).

> To prevail on an aiding and abetting claim, a plaintiff must show (1) that the defendant committed a wholly individual and distinct wrong . . . separate and distinct from the claim in main; (2) that the aider or abetter shared an intent to discriminate not unlike that of the alleged principal offender; and (3) that the aider or abetter knew of his or her supporting role in an enterprise designed to deprive [the plaintiff] of a right guaranteed him or her under G.L. c. 151B.

---

the [sexual harassment] sections of G.L. c. 151B differ significantly from Title VII of the Federal act. Of particular importance . . . is the fact that the Legislature specifically defined sexual harassment and, at the same time, codified the prohibition against it. . . . There is no parallel Federal statutory language. . . . [A]ny physical or verbal conduct of a sexual nature which is found to interfere unreasonably with an employee's work performance through the creation of a humiliating or sexually offensive work environment can be sexual harassment under G.L. c. 151B.

*Melnychenko v. 84 Lumber Co.*, 676 N.E.2d 45, 48 (Mass. 1997). *See also Cuddyer*, 750 N.E.2d at 939 ("In construing G.L. c. 151B, we frequently do not follow the reasoning of Federal appellate decisions applying Title VII.").

*Id.* (citing *Lopez v. Commonwealth,* 978 N.E.2d 67, 82 (Mass. 2012) (quotations omitted)).

While "a straightforward reading of the statute leads to the conclusion that an employer can aid or abet its own employees," *Walters v. President & Fellows of Harvard Coll.*, 616 F. Supp. 471, 474 (D. Mass. 1985), Defendant is entitled to summary judgment because Plaintiff fails to allege that Defendant committed a wrong that is "separate and distinct from the main" allegation of sexual harassment under Chapter 151B and fails to allege individual liability by her managers and coworkers. *Ping Zhao*, 982 F. Supp. 2d at 115. Plaintiff conceded as much at oral argument.

VI.     C̲ONCLUSION̲

For the reasons stated above, Defendant's motion for summary judgment (Dkt. No. 79) is granted as to so much of Counts II and IV as allege constructive discharge and failure to provide a reasonable accommodation and as to Count VII, which alleges a claim of aiding and abetting discrimination under Chapter 151B, and denied as to so much of Counts II (ADA) and V (Chapter 151B) as allege a hostile work environment, as to Count III, which alleges retaliation under the ADA by subjecting Plaintiff to a hostile work environment, and as to Count VI, which alleges sexual harassment under Chapter 151B. Defendant's motion to strike paragraph 14 of Plaintiff's supporting affidavit (Dkt. No. 88) is granted.

The clerk's office is directed to schedule a case management conference on February 22, 2017 at 11:00 A.M..

It is so ordered.

Dated:  February 7, 2017                                            /s/ Katherine A. Robertson
                                                                              KATHERINE A. ROBERTSON
                                                                              United States Magistrate Judge